IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-449

No. COA20-418

Filed 7 September 2021

Nash County, No. 15 CVS 1134

FRED COHEN, Executor of the Estate of DENNIS ALAN O'NEAL, Deceased, and FRED COHEN, Executor of the Estate of DEBRA DEE O'NEAL, Deceased, Plaintiffs

v.

CONTINENTAL MOTORS, INC. (f/k/a TELEDYNE CONTINENTAL MOTORS, INC. and/or TELEDYNE CONTINENTAL MOTORS); and AIRCRAFT ACCESSORIES OF OKLAHOMA, INC., Defendants

Appeal by Plaintiffs from Order entered 12 March 2020 by Judge James L. Gale in Nash County Superior Court. Heard in the Court of Appeals 12 May 2021.

*Blanchard, Miller, Lewis & Isley, P.A., by Philip R. Miller, III; and The Wolk Law Firm, by Michael S. Miska, pro hac vice, for plaintiff-appellant.*

*Armbrecht Jackson LLP, by Lacey D. Smith, Sherri R. Ginger, and Timothy A. Heisterhagen; and Williams Mullen, by Elizabeth D. Scott, for defendant-appellee.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P., by J. Mitchell Armbruster, Christopher R. Kiger, and Amelia L. Serrat, for amicus curiae North Carolina Association of Defense Attorneys.*

HAMPSON, Judge.

**Factual and Procedural Background**

¶ 1        Fred Cohen (Plaintiff), Executor of the Estates of Debra Dee O'Neal and Dennis Alan O'Neal (the O'Neals), appeals from an Order granting a Motion to

Dismiss for Lack of Personal Jurisdiction entered in favor of Continental Motors, Inc. (CMI). The Record before us tends to reflect the following:

### The Accident

At approximately 12:30 p.m. on 31 March 2013, the O'Neals, residents of Blounts Creek, North Carolina, took off from Wilkes County Airport in North Wilkesboro, North Carolina, flying a Lancair LC42-550FG (the Aircraft) destined for Warren Field Airport in Washington, North Carolina. The O'Neals were licensed and experienced aircraft pilots; Debra O'Neal piloted the Aircraft. After the Aircraft climbed to 5,000 feet, at 12:46 p.m. "the pilot declared an emergency and reported[:] . . . 'low fuel pressure -- engine's quitting.' " "[An] air traffic controller vectored the airplane toward" Smith Reynolds Airport in Winston-Salem. "[D]uring the descent[,] the pilot reported smoke in the cockpit and subsequently reported that the engine was 'barely' producing power." Data from the accident would later reveal the engine had lost power after losing oil pressure. At 12:50 p.m., approximately three miles west of Smith Reynolds Airport, the Aircraft made a forced landing, collided with trees and terrain, and burst into flames, killing both O'Neals. Plaintiff was appointed as the Executor of the O'Neals respective Estates.

### Continental Motors, Inc.

CMI "is a Delaware corporation with a principal place of business in Mobile, Alabama." "CMI is engaged in the business of designing, manufacturing, and selling

aircraft engines and component parts." According to its then-Director of Certification and Airworthiness, Michael E. Ward (Ward), during deposition, "C[MI] markets to the flying public at large . . . [and] ha[s] an international market." In fact, CMI claims, "[f]rom 2010 to 2013, [it] sold parts in all fifty United States[,]" including North Carolina, "as well as in other countries."

¶ 4 CMI's business model involves "sell[ing] through distribution, so [it] ha[s] distributors that purchase [CMI] parts and sell [them] into the aviation public." Thus, from 2010 to 2013, "distributors would order parts from C[MI], and the[] [parts] would be shipped either to the distributor or drop-shipped to the customer at the distributor's request." "Triad Aviation" (Triad), "located in Burlington, North Carolina . . . operated as a distributer for C[MI] parts from 2010 to 2013." More specifically, "[f]rom May 2010 to August 2013, C[MI] engaged in 2,948 sales of component parts with a total value of $3,933,480.65 through Triad . . . ." North Carolina "orders were taken from Triad . . . , and the parts were delivered either to Triad or drop shipped at [customers'] instructions."[1]

¶ 5 During the 2010-2013 period, Air Care Aviation Services (Air Care), "a

---

[1] As Timothy J. Padgett (Padgett), then-Director of Maintenance at Air Care Aviation Services, confirmed during his deposition, "if [someone] needed to get . . . a C[MI] part for [their] plane, [they]'d call up . . . Triad" or another distributor known as "Aviall . . . to get it[.]" However, "if [customers] need[ed] to troubleshoot a problem with a [CMI] component . . . [they]'d have to go to C[MI] for that."

maintenance and avionics provider" headquartered and with principal place of business in North Carolina, sold and serviced CMI components. CMI made "no direct sales to Air Care"; however, "Triad . . . purchased approximately twelve (12) products from C[MI] that were drop-shipped to Air Care from approximately May 2010 to August 2013." Although it does not appear it was standard practice to do so at the time, "on occasion" Air Care would call CMI for support.

¶ 6        CMI "[wa]s the Type Certificate Holder for IO-550-N series engines such as the" engine inside the Aircraft, "and provide[d] continued airworthiness instructions for that engine series in compliance with Federal Aviation Administration . . . regulations[.]" During the 2010-2013 period, CMI's "in-house[,]" "online technical library and the service instructions it contained were available to service centers like Air Care through a subscription to C[MI]'s FBO[2] Services Link." "To subscribe to C[MI]'s FBO Service[s] Link, a subscriber would go to C[MI]'s website to create a profile and pay a subscription fee." "Once that fee was paid, the computer program would authorize the subscription, and [subscribers] would have access to the publications." CMI would then "post[] service updates to service bulletins in its online

---

[2] According to the FAA, FBO stands for "Fixed Base Operator." Federal Aviation Administration, *Airport Acronyms and Abbreviations* 43, https://www.faa.gov/airports/resources/acronyms/#f (last visited July 21, 2021). "A Fixed Base Operator engages in and furnishes a full range of aeronautical products, services and facilities to the public[.]" Duluth International Airport, *Rules and Standards*, (June 2014) https://www.lsc.edu/wp-content/uploads/DLH-Rules-and-Standards.pdf.

library and notif[y] subscribers of those updates through e-mail broadcasts." Through this technical library, "subscribers would have access to manuals, overhaul manuals, [and] maintenance manuals, [all] for [the] subscription fee." Additionally, "[w]hen an engine ships from C[MI], there is a log-book package that goes with the engine. And as part of that log-book package there is a compact disc that has the maintenance manuals for that engine as well as some other information."[3] In summary, during the 2010-2013 period, all this information was made available to subscribers directly from CMI. CMI "had fourteen North Carolina subscribers[,]" including Air Care.

### The Aircraft

At the time of the crash, the Aircraft was privately owned by the O'Neals and registered in North Carolina. Prior to the O'Neals' purchase of the Aircraft in 2010, it had been owned by at least one other owner. The Aircraft, manufactured in 2003, "was equipped with a C[MI] IO-550N, 310-horsepower engine." "CMI designed and manufactured the IO-550-N2B engine . . . at its facility in Mobile, Alabama." "The [e]ngine was sold and shipped to The Lancair Company . . . in Bend, Oregon on or around March 31, 2002." "The [e]ngine was [then] installed in the . . . [A]ircraft[.]"

"The [e]ngine, as sold by CMI to Lancair, was assembled with a starter

---

[3] According to Ward, CMI also had, "from September 2013 to May of 2015 . . . one employee, a service representative, who was based out of North Carolina, although his duties were unrelated to this matter."

adapter[4] . . . in accordance with CMI's FAA-approved Type Design Data for the [e]ngine." "[T]h[is] original starter adapter . . . assembled to the [e]ngine by CMI was removed and replaced with a different model starter adapter . . . sometime while the Aircraft and [e]ngine were at Lancair's facility in Bend[.]"

¶ 9        The O'Neals were customers of Air Care, and Air Care provided service and maintenance for the Aircraft.  As part of its servicing and maintenance of the Aircraft, "Air Care installed a third starter adapter" (the Starter Adapter), "which was on the [e]ngine at the time of the accident[.]"  Air Care "purchased the Starter Adapter from [d]efendant Aircraft Accessories of Oklahoma, Inc." (Aircraft Accessories) "as an overhauled starter adapter unit on or around January 29, 2013."  This overhauled replacement was made because the second starter adapter "was slipping."[5]  The third and final Starter Adapter was a CMI component, overhauled by Aircraft Accessories.

¶ 10        Air Care mechanic Justin Pearson (Pearson) installed the Starter Adapter "on or around February 11, 2013."  Pearson used CMI's "maintenance manual to reinstall the engine and the engine mounts," as well as to "reinstall[] [the] A/C mount bracket, A/C compressor, air oil separat[o]r and starter with new O-ring . . . ."  In fact, Air Care's mechanics at large "were expected to" use CMI's online library through Air

---

[4] According to Padgett, a starter adapter is "a component that resides on the back of the engine which engages with the drive of the engine for the starter."

[5] During his deposition, Padgett testified "slipping" "means that when your starter's engaged, that the adapter is not turning the engine over."

Care's subscription when Air Care inspectors determined it was necessary for the mechanics to do so. Furthermore, "[t]he service instructions pertaining to the installation of the . . . Starter Adapter were in C[MI]'s IO-550 Permold Series Engine Maintenance and Overhaul Manual . . . ." As to whether the Starter Adapter was installed pursuant to CMI's manual, Timothy J. Padgett (Padgett), Director of Maintenance at Air Care, testified the following in deposition:

> Q. . . . . Do you expect that Air Care and [] Pearson would have followed the maintenance instructions with respect to the installation of the [S]tarter [A]dapter that C[MI] provided?
> A. Yes.
> Q. Do you believe that you used anybody's installation instructions for that [S]tarter [A]dapter?
> A. No.
> Q. In fact, do you believe [Pearson] solely followed the maintenance and installation procedures set forth in the C[MI] manual?
> A. Yes.
> Q. Is it Air Care's practice to utilize this manual as far as what instructions it uses in performing maintenance?
> A. Yes.
> Q. Do you believe that [] Pearson would have inspected the [S]tarter [A]dapter that was received from Aircraft Accessories of Oklahoma in accordance with the procedures enumerated in Section 10 of the C[MI] manual?
> A. I believe so.
> Q. Do you believe [] Pearson inspected it to see if there was a plug installed that's been identified in the parts diagram as either number 54 or number 55?
> A. I would believe so.
> Q. And when you signed off on that logbook entry, did you believe that the installation had been done in accordance with the C[MI] instructions?
> A. Yes.

Plaintiff's Suit

On 12 March 2015, Plaintiff filed the Complaint on behalf of the Estates against CMI and Air Care, among others.[6] Against CMI, Plaintiff alleged claims including: Strict Liability; Negligence; Breach of Express and Implied Warranties; Negligent Misrepresentation; Fraud; "Recklessness, Outrageousness, Willful and Wanton Conduct"; and a claim under N.C. Gen. Stat. Section 75-1.1. "[The] claims against C[MI] are predicated upon two theories of liability—that the . . . Starter Adapter was subject to a design defect, and that the Service Manual upon which Air Care allegedly relied when installing the . . . Starter Adapter was defective."

On 22 May 2015, CMI filed its Answer, which included as an affirmative defense: "[t]hese Defendants assert that this Court does not have personal jurisdiction over these Defendants." On 2 November 2018, after several years and a few exchanges of discovery, CMI filed a Motion to Dismiss the Complaint under Rule 12(b)(2) of the North Carolina Rules of Civil Procedure for Lack of Personal Jurisdiction. In its Motion, CMI, in relevant part, argued the following:

> Neither the engine, nor the [S]tarter [A]dapter in question, was designed, manufactured, or sold by CMI in North Carolina. Instead, the engine and the [S]tarter [A]dapter were designed and manufactured in Alabama. The engine, with its original starter adapter, was then sold from CMI's factory in Mobile to Lancair in

---

[6] The Complaint was originally filed in Wilson County; venue was then changed to Nash County.

Bend, Oregon. The original starter adapter was then later removed by third parties and eventually replaced with an overhauled part provided by third parties. The engine and accident [S]tarter [A]dapter ended up in North Carolina not through CMI's actions, but rather through the unilateral actions of other parties.

. . . .

CMI is not currently registered or otherwise licensed to do business in North Carolina, although it was registered with the North Carolina Secretary of State . . . for a brief period from November 2013 to August 2015 . . . .

In the last five years, CMI has not maintained offices, places of business, post office boxes, or telephone listings in North Carolina; has had no real estate, bank accounts, or other interests in property in North Carolina; did not incur any obligation to pay, and has not paid, income taxes in North Carolina; did not have any warehouses, repair stations, sales agents, dealers, or other sales representatives located in North Carolina on a permanent or regular basis; has not conducted any regular or ongoing advertising, solicitation, marketing, or other sales promotions directed toward residents of North Carolina; and has not contracted to do business with any resident of North Carolina for purposes of distributing, servicing or marketing goods . . . .

¶ 13    The trial court heard arguments on CMI's Motion on 10 September 2019, during which the parties submitted affidavits and depositions in support of their respective arguments. The trial court further permitted limited additional discovery to be conducted post-hearing on the issue of personal jurisdiction and invited the parties to submit supplemental briefing. "After supplemental materials and briefs were submitted, the [trial] [c]ourt heard further oral argument on February 6, 2020."

¶ 14    In an Order dated 12 March 2020, the trial court granted CMI's Motion to

Dismiss for Lack of Personal Jurisdiction, concluding, in pertinent part: "C[MI] has not waived its defense to personal jurisdiction and is not estopped from asserting it;" and "Plaintiff has not demonstrated that the exercise of specific jurisdiction over C[MI] is appropriate by a preponderance of evidence . . . ." With respect to the issue of waiver, the trial court reasoned, "[a]cknowledging that North Carolina's appellate courts have not addressed at length the issue of post-objection waiver[,]" that "[i]n most federal cases, the courts have required more than the passage of time and participation in limited discovery to find waiver" and "[i]n circumstances where waiver is found, the defendant has usually fully participated in the merits of the litigation or sought affirmative relief from the court." Thus, the trial court concluded CMI, after raising the defense of lack of personal jurisdiction in its Answer, "ha[d] participated only in limited written discovery bearing on matters related to specific jurisdiction and ha[d] requested no affirmative relief from the [c]ourt[.]"

¶ 15        Next, on the merits of CMI's Motion to Dismiss for Lack of Personal Jurisdiction, the trial court supported its conclusion with the following reasoning:

> "To determine whether it may assert specific jurisdiction over a defendant, the court considers '(1) the extent to which the defendant "purposefully availed" itself of the privilege of conducting activities in the State; (2) whether the plaintiff['s] claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally "reasonable." ' "
>
> . . . .

While C[MI]'s broader contacts with North Carolina may be pertinent to the final question of whether exercising personal jurisdiction would be reasonable, the [c]ourt concludes that C[MI]'s characterization of the purposeful availment inquiry is consistent with controlling case law . . . .

"The United State[s] Supreme Court has emphasized that 'specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction.' "

. . . .

First, even if the [c]ourt assumes without deciding that C[MI]'s distributor relationships and sales in North Carolina are purposeful contacts with the State adequate to satisfy specific jurisdiction over claims arising from those contacts, those are unrelated to Plaintiff's claims against C[MI] in this litigation.

. . . .

Second, the Court agrees with C[MI] that the specific acts connected to the accident upon which Plaintiff relies do not support a finding that C[MI] purposely availed itself of doing business in North Carolina regarding those acts. Specifically, Plaintiff relies on C[MI]'s Service Manual and the FBO Services Link through which the Service Manual was made available to Air Care.

. . . .

A passive [w]eb site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction.

The trial court then granted CMI's Motion. Plaintiff filed written Notice of Appeal on 9 April 2020.

## **Appellate Jurisdiction**

¶ 16          "An interlocutory order is one made during the pendency of an action, which does not dispose of the case, but leaves it for further action by the trial court in order to settle and determine the entire controversy." *Veazey v. City of Durham*, 231 N.C. 357, 362, 57 S.E.2d 377, 381 (1950). Here, the Order granting CMI's Motion to Dismiss for Lack of Personal Jurisdiction is interlocutory because it does not dispose of the case in that it leaves Plaintiff's claims against Aircraft Accessories still pending for resolution.[7] *See Peterson v. Dillman*, 245 N.C. App. 239, 242, 782 S.E.2d 362, 365 (2016) ("An appeal is interlocutory when noticed from an order entered during the pendency of an action, which does not dispose of the entire case and where the trial court must take further action in order to finally determine the rights of all parties involved in the controversy." (citation omitted)). "Generally, there is no right of immediate appeal from interlocutory orders and judgments." *Sharpe v. Worland*, 351 N.C. 159, 161, 522 S.E.2d 577, 578 (1999) (citations omitted). However, by statute, "[a]ny interested party shall have the right of immediate appeal from an adverse ruling as to the jurisdiction of the court over the person or property of the defendant or such party may preserve his exception for determination upon any subsequent

---

[7] In an earlier appeal in this case, this Court affirmed the trial court's denial of Aircraft Accessories' Motion to Dismiss for Lack of Personal Jurisdiction, holding "the trial court did not err by concluding that Aircraft Accessories had sufficient minimum contacts with North Carolina to justify the exercise of personal jurisdiction over it without violating the due process clause." *Cohen v. Cont'l Motors, Inc.*, 253 N.C. App. 407, 799 S.E.2d 72 (2017) (unpublished) (slip op. at *11).

appeal in the cause." N.C. Gen. Stat. § 1-277(b) (2019); *see also* § 7A-27(b)(4) ("[A]ppeal lies of right directly to the Court of Appeals . . . [f]rom any . . . order or judgment of the superior court from which an appeal is authorized by statute.").

¶ 17 Furthermore, "immediate appeal is available from an interlocutory order or judgment which affects a 'substantial right.'" *Sharpe*, 351 N.C. at 162, 522 S.E.2d at 579 (citations omitted); *see also* N.C. Gen. Stat. § 1-277(a) ("An appeal may be taken from every judicial order or determination of a judge of a superior or district court, upon or involving a matter of law or legal inference, whether made in or out of session, which affects a substantial right claimed in any action or proceeding . . . ."); *see also* § 7A-27(b)(3)(a) ("[A]ppeal lies of right directly to the Court of Appeals . . . [f]rom an interlocutory order or judgment of a superior court or district court in a civil action or proceeding that . . . [a]ffects a substantial right."). This Court has concluded "motions to dismiss for lack of personal jurisdiction affect a substantial right and are immediately appealable." *A.R. Haire, Inc. v. St. Denis*, 176 N.C. App. 255, 257-58, 625 S.E.2d 894, 898 (2006). Accordingly, immediate appeal is appropriate in this case.

## Issues

¶ 18 The relevant issues on appeal are whether the trial court erred by granting CMI's Motion to Dismiss for Lack of Personal Jurisdiction on the bases: (I) CMI had not waived its personal jurisdiction challenge; and (II) the trial court lacked personal

jurisdiction over CMI.

## **Analysis**

¶ 19    "The standard of review to be applied by a trial court in deciding a motion under Rule 12(b)(2) depends upon the procedural context confronting the court." *Banc of Am. Secs. LLC v. Evergreen Int'l Aviation, Inc.*, 169 N.C. App. 690, 693, 611 S.E.2d 179, 182 (2005).

> Typically, the parties will present personal jurisdiction issues in one of three procedural postures: (1) the defendant makes a motion to dismiss without submitting any opposing evidence; (2) the defendant supports its motion to dismiss with affidavits, but the plaintiff does not file any opposing evidence; or (3) both the defendant and the plaintiff submit affidavits addressing the personal jurisdiction issues.

*Id*.    In this case, the parties submitted dueling affidavits and other discovery materials in support of their respective jurisdictional arguments; therefore, this case falls into the third category.  *See id.*

¶ 20    If the parties "submit dueling affidavits[,] . . . the court may hear the matter on affidavits presented by the respective parties, . . . [or] the court may direct that the matter be heard wholly or partly on oral testimony or depositions."  *Id*. at 694, 611 S.E.2d at 183 (second and third alterations in original; citations and quotation marks omitted); *see also Bruggeman v. Meditrust Acquisition Co.*, 138 N.C. App. 612, 615, 532 S.E.2d 215, 217 (2000) ("If the exercise of personal jurisdiction is challenged by a defendant, a trial court may hold an evidentiary hearing including oral testimony

or depositions or may decide the matter based on affidavits." (citation omitted)). In addition, where "defendants submit some form of evidence to counter plaintiffs' allegations, those allegations can no longer be taken as true or controlling and plaintiffs cannot rest on the allegations of the complaint." *Bruggeman*, 138 N.C. App. at 615-16, 532 S.E.2d at 218 (citations omitted). Where the trial court elects to decide the motion to dismiss on competing affidavits, "the plaintiff has the initial burden of establishing *prima facie* that jurisdiction is proper. Of course, this procedure does not alleviate the plaintiff's ultimate burden of proving personal jurisdiction at an evidentiary hearing or at trial by a preponderance of the evidence." *Id.* at 615, 532 S.E.2d at 217 (citations omitted). "If the trial court chooses to decide the motion based on affidavits, the trial judge must determine the weight and sufficiency of the evidence presented in the affidavits much as a juror." *Banc of Am. Secs. LLC*, 169 N.C. App. at 694, 611 S.E.2d at 183 (alterations, citation, and quotation marks omitted).

¶ 21   Thus, in this context, "[t]he standard of review of an order determining personal jurisdiction is whether the findings of fact by the trial court are supported by competent evidence in the record[.]" *Bell v. Mozley*, 216 N.C. App. 540, 543, 716 S.E.2d 868, 871 (2011) (second alteration in original; quotation marks omitted) (quoting *Replacements, Ltd. v. MidweSterling*, 133 N.C. App. 139, 140-41, 515 S.E.2d 46, 48 (1999)). "We review *de novo* the issue of whether the trial court's findings of

fact support its conclusion of law that the court has personal jurisdiction over defendant." *Id*. (citation omitted).

## I. Waiver

Plaintiff argues the trial court erred in concluding CMI had not waived its defense of Lack of Personal Jurisdiction by way of its "long participation in litigation on the merits" and, thus, in allowing CMI to raise this challenge in its Motion to Dismiss for Lack of Personal Jurisdiction.

"Every defense, in law or fact, to a claim for relief in any pleading . . . shall be asserted in the responsive pleading thereto if one is required, *except*[,]" among others, "[l]ack of jurisdiction over the person[,]" which "may at the option of the pleader be made by motion . . . ." N.C. Gen. Stat. § 1A-1, Rule 12(b)(2) (emphasis added). Rule 12(b) further provides:

> A motion making any of these defenses shall be made before pleading if a further pleading is permitted. The consequences of failure to make such a motion shall be as provided in sections (g) and (h). No defense or objection is waived by being joined with one or more other defenses or objections in a responsive pleading or motion.

§ 1A-1, 12(b). Then, per Rule 12(h),

> [a] defense of lack of jurisdiction over the person . . . is waived (i) if omitted from a motion in the circumstances described in section (g), or (ii) if it is neither made by motion under this rule nor included in a responsive pleading or an amendment thereof permitted by Rule 15(a) to be made as a matter of course.

§ 1A-1, Rule 12(h)(1).

Here, CMI raised the defense of Lack of Personal Jurisdiction in its Answer to Plaintiff's Complaint. Thus, pursuant to Rule 12 of our statutory Rules of Civil Procedure, because CMI raised this defense in a responsive pleading, CMI's jurisdictional challenge was not waived. *See id.*; *see also Ryals v. Hall-Lane Moving & Storage Co.*, 122 N.C. App. 242, 247, 468 S.E.2d 600, 604 (1996) ("A defendant . . . cannot submit himself to the jurisdiction of the court or waive the defense of lack of personal jurisdiction by filing an answer which contains the defense of lack of personal jurisdiction . . . and/or engaging in discovery[.]" (citations omitted)). Accordingly, CMI's Motion to Dismiss for Lack of Personal Jurisdiction was not improper, and the trial court did not err in concluding CMI had not waived its jurisdictional challenge.

## II. Personal Jurisdiction

The North Carolina Supreme Court has held

> that a two-step analysis must be employed to determine whether a non-resident defendant is subject to the *in personam* jurisdiction of our courts. First, the transaction must fall within the language of the State's "long-arm" statute. Second, the exercise of jurisdiction must not violate the due process clause of the fourteenth amendment to the United States Constitution.

*Tom Togs, Inc. v. Ben Elias Indus. Corp.*, 318 N.C. 361, 364, 348 S.E.2d 782, 785 (1986) (citations omitted). In this case, the parties appear to agree North Carolina's

"long-arm" statute is applicable to this case. Rather, the parties focus on the question of whether the exercise of personal jurisdiction in this case is consistent with the Due Process Clause of the Fourteenth Amendment.

¶ 26        The Supreme Court of the United States recently addressed the issue of a state court's authority to assert personal jurisdiction over an out-of-state Defendant under the Fourteenth Amendment in *Ford Motor Co. v. Montana Eight Jud. Dist. Ct.*, ___ U.S. ___ (2021).[8]  "The Fourteenth Amendment's Due Process Clause limits a state court's power to exercise jurisdiction over a defendant." *Id.* at ___ (slip op. at *4).  Our courts "recogniz[e] two kinds of personal jurisdiction: general . . . jurisdiction and specific . . . jurisdiction." *Id.* at ___ (slip op. at *5) (citing *Goodyear Dunlop Tires Operations, S. A. v. Brown*, 564 U.S. 915, 919 (2011)).  Specific jurisdiction "covers defendants less intimately connected with a State, but only as to a narrower class of claims.  The contacts needed for this kind of jurisdiction often go by the name 'purposeful availment.' " *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).  "The defendant . . . must take 'some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State.' " *Id.* (bracket in original) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253 (1985)).  "The contacts must be the defendant's own choice and not 'random, isolated, or fortuitous.' " *Id.* at

_____

[8] We acknowledge that the trial court did not have the benefit of this decision at the time it ruled on CMI's Motion.

___ (slip op. at *6) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)). "The[se] [contacts] must show that the defendant deliberately 'reached out beyond' its home—by, for example, 'exploi[ting] a market' in the forum State or entering a contractual relationship centered there.' " *Id.* (second bracket in original) (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014)). "Yet even then . . . the forum State may exercise jurisdiction in only certain cases. The plaintiff's claims . . . 'must arise out of or relate to the defendant's contacts' with the forum." *Id.* (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cty.*, 582 U.S. ___, ___, 137 S.Ct. 1773, 1780 (2017)). "[P]ut just a bit differently, there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.* (second bracket in original; quotation marks omitted) (quoting *Bristol-Myers*, 582 U.S. at ___, 137 S.Ct. at 1780).

In *Ford*, the action arose out of two distinct vehicle accidents, in Montana and Minnesota respectively, involving two Ford vehicles. *Id.* at ___ (slip op. at *2). Ford, the defendant, "a global auto company . . . incorporated in Delaware and headquartered in Michigan[,]" conceded "it does substantial business in Montana and Minnesota[,] that it actively seeks to serve the market for automobiles and related products in those [s]tates[,]" and that "it ha[d] purposefully avail[ed] itself of the privilege of conducting activities in both places." *Id.* at ___ (slip op. at *2, 7-8) (last

bracket in original; quotation marks omitted). However, Ford argued "those activities d[id] not sufficiently connect to the suits, even though the resident-plaintiffs allege that Ford cars malfunctioned in the forum States. In Ford's view, the needed link [had to] be causal in nature[,]" claiming "[j]urisdiction attaches only if the defendant's forum conduct *gave rise* to the plaintiff's claims." *Id.* at ___ (slip op. at *8) (quotation marks omitted).

¶ 28       The Supreme Court disagreed:

> None of our precedents has suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do. As just noted, our most common formulation of the rule demands that the suit "arise out of *or relate to* the defendant's contacts with the forum." The first half of that standard asks about causation; but the back half, after the "or," contemplates that some relationships will support jurisdiction without a causal showing. That does not mean anything goes. In the sphere of specific jurisdiction, the phrase "relate to" incorporates real limits, as it must to adequately protect defendants foreign to a forum. But again, *we have never framed the specific jurisdiction inquiry as always requiring proof of causation—i.e., proof that the plaintiff's claim came about because of the defendant's in-state conduct*.

*Id.* at ___ (slip op. at *8-9) (last emphasis added; citations omitted). The Supreme Court then drew the following example:

> [I]ndeed, this Court has stated that specific jurisdiction attaches in cases identical to the ones here—when a company like Ford serves a market for a product in the forum State and the product malfunctions there. In *World-Wide Volkswagen*, the Court held that an Oklahoma court could not assert jurisdiction over a New York car dealer just because a car it sold later caught fire in

Oklahoma.  But in so doing, we contrasted the dealer's position to that of two other defendants—Audi, the car's manufacturer, and Volkswagen, the car's nationwide importer (neither of which contested jurisdiction):

"[I]f the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in [several or all] other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others."

Or said another way, if Audi and Volkswagen's business deliberately extended into Oklahoma (among other States), then Oklahoma's courts could hold the companies accountable for a car's catching fire there—even though the vehicle had been designed and made overseas and sold in New York.  For, the Court explained, a company thus "purposefully avail[ing] itself" of the Oklahoma auto market "has clear notice" of its exposure in that State to suits arising from local accidents involving its cars.  And the company could do something about that exposure: It could "act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are [still] too great, severing its connection with the State."

*Id.* at ___ (slip op. at *9-10) (all but first alterations in original; citations omitted).

Then, the Supreme Court reasoned:

Ford had systematically served a market in Montana and Minnesota for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States.  So there is a strong "relationship among the defendant, the forum, and the litigation"—the "essential foundation" of specific jurisdiction.  That is why this Court has used this exact fact pattern (a resident-plaintiff sues a global car company, extensively serving the state market in a vehicle, for an in-state accident) as an illustration—even a paradigm example—of how specific jurisdiction works.

*Id.* at \_\_\_ (slip op. at *12) (citations omitted).

¶ 29        The fact pattern before us in the instant case is analogous. Here, CMI, by its employee's own admission, "markets to the flying public at large . . . [and] ha[s] an international market." In fact, "[f]rom 2010 to 2013, C[MI] sold parts in all fifty United States as well as in other countries[,]" which included the forum state, North Carolina. Although CMI did not sell components to individual aircraft owners themselves, it actively maintained a business model that operated through independent distributors—including Triad, based in North Carolina. This made it so that if aircraft owners in North Carolina needed to purchase CMI parts, they would do so through Triad. Furthermore, during the time frame of the accident, CMI made it so that individuals across its international market, including those in North Carolina, could access its online database for a fee, thus drawing a benefit to itself from the "privilege of conducting activities" with North Carolina subscribers. *See id.* at \_\_\_ (slip op. at *5). One such North Carolina subscriber, Air Care, was in fact "expected to" rely on the information CMI provided through its subscriptions to operate on any aircrafts bearing CMI parts. In fact, even presuming *arguendo* Pearson, the Air Care mechanic, did not rely on CMI instructions to install the Starter Adapter, the evidence clearly indicates Pearson did indeed rely on CMI literature to operate on other components inside the O'Neals' Aircraft. The facts, thus, paint a clear picture: at the time of the accident, CMI "serve[d] a market for a product in the

forum [s]tate" of North Carolina. *See id.* at ___ (slip op. at *9).

¶ 30 Consistent with CMI's business model, CMI's Starter Adapter was overhauled by Aircraft Accessories, moved to Triad (in North Carolina), then to Air Care (in North Carolina), and was finally installed in the O'Neals' Aircraft (in North Carolina). Thereafter, CMI's product allegedly malfunctioned in North Carolina, causing the accident. Applying the reasoning of *Ford* to this case: "the sale of [CMI's] product . . . [wa]s not simply an isolated occurrence, but ar[o]se[] from the efforts of [CMI] to serve, *directly or indirectly*, the [North Carolina] market . . . ." *See id.* at ___ (slip op. at *10) (emphasis added). In fact, "[f]rom May 2010 to August 2013, C[MI] engaged in 2,948 sales of component parts with a total value of $3,933,480.65" in North Carolina, serving the North Carolina market indirectly by operating "through Triad . . . ." Thus, "it is not unreasonable to subject [CMI] to suit in [North Carolina]" since "its allegedly defective [Starter Adapter] has there been the source of injury to its owner[s][,]" the O'Neals. *See id.*

¶ 31 Indeed, "this exact fact pattern (a resident-plaintiff sues a global [aviation] company, extensively serving the state market . . . for an in-state accident)" also effectively functions "as an illustration—even a paradigm example—of how specific jurisdiction works." *See id.* at ___ (slip op. at *2). Therefore, applying *Ford* to the particular facts of this case, exercise of personal jurisdiction in North Carolina over CMI does not offend the Due Process Clause of the Fourteenth Amendment.

Consequently, in light of the *Ford* opinion issued after the trial court's Order in this case, we must conclude the trial court erred in granting CMI's Motion to Dismiss for Lack of Personal Jurisdiction on this basis.

## **Conclusion**

Accordingly, for the foregoing reasons, we affirm in part and reverse in part the trial court's Order granting CMI's Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction. We remand this matter to the trial court for purposes of permitting the parties to pursue further proceedings on the merits of this litigation.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Judge WOOD concurs.

Judge TYSON concurs in part and concurs in the result in part by separate opinion.

TYSON, Judge, concurring in part and concurring in the result in part.

I fully concur with the majority's analysis and conclusion that Continental Motors, Inc. ("CMI") properly raised the defense of lack of personal jurisdiction in its Answer to Plaintiff's Complaint. Because this defense was raised in its first responsive pleading, CMI's jurisdictional challenge was not waived. I also agree and concur with the conclusion this interlocutory appeal is properly before this Court.

I concur in the result with the majority's opinion holding CMI can be haled into North Carolina's courts consistent with the Due Process Clause of the Fourteenth Amendment and North Carolina's long-arm jurisdiction statute. I write separately to catalog and limit the analysis on specific personal jurisdiction to CMI's activities within North Carolina. The trial court's order granting CMI's Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction, entered prior to the Supreme Court of the United States' decision in *Ford*, is properly affirmed in part, reversed in part, and remanded.

CMI's Motion to Dismiss the Complaint, under Rule 12(b)(2) of the North Carolina Rules of Civil Procedure for Lack of Personal Jurisdiction, argued, in relevant part, the following:

> Neither the engine, nor the [S]tarter [A]dapter in question, was designed, manufactured, or sold by CMI in North Carolina. Instead, the engine and the [S]tarter [A]dapter were designed and manufactured in Alabama. The engine, with its original starter adapter, was then sold from CMI's factory in Mobile to Lancair in Bend, Oregon. The original starter adapter was then later removed by third parties and eventually replaced with an

overhauled part provided by third parties. The engine and accident [S]tarter [A]dapter ended up in North Carolina not through CMI's actions, but rather through the unilateral actions of other parties.

. . . .

CMI is not currently registered or otherwise licensed to do business in North Carolina, although it was registered with the North Carolina Secretary of State . . . for a brief period from November 2013 to August 2015 . . . .

In the last five years, CMI has not maintained offices, places of business, post office boxes, or telephone listings in North Carolina; has had no real estate, bank accounts, or other interests in property in North Carolina; did not incur any obligation to pay, and has not paid, income taxes in North Carolina; did not have any warehouses, repair stations, sales agents, dealers, or other sales representatives located in North Carolina on a permanent or regular basis; has not conducted any regular or ongoing advertising, solicitation, marketing, or other sales promotions directed toward residents of North Carolina; and has not contracted to do business with any resident of North Carolina for purposes of distributing, servicing or marketing goods . . . .

The trial court granted CMI's Motion to Dismiss for Lack of Personal Jurisdiction, and properly supported its conclusion with the following reasoning:

> To determine whether it may assert specific jurisdiction over a defendant, the court considers "(1) the extent to which the defendant 'purposefully availed' itself of the privilege of conducting activities in the State; (2) whether the plaintiff['s] claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'"
>
> . . . .
>
> While C[MI]'s broader contacts with North Carolina may be

pertinent to the final question of whether exercising personal jurisdiction would be reasonable, the [c]ourt concludes that C[MI]'s characterization of the purposeful availment inquiry is consistent with controlling case law . . . .

The United State[s] Supreme Court has emphasized that "specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction."

. . . .

First, even if the [c]ourt assumes without deciding that C[MI]'s distributor relationships and sales in North Carolina are purposeful contacts with the State adequate to satisfy specific jurisdiction over claims arising from those contacts, those are unrelated to Plaintiff's claims against C[MI] in this litigation.

. . . .

Second, the [c]ourt agrees with C[MI] that the specific acts connected to the accident upon which Plaintiff relies do not support a finding that C[MI] purposely availed itself of doing business in North Carolina regarding those acts. Specifically, Plaintiff relies on C[MI]'s Service Manual and the FBO Services Link through which the Service Manual was made available to Air Care.

. . . .

A passive [w]eb site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction.

## I. Personal Jurisdiction

After the trial court's order was entered, the Supreme Court of the United States issued a relevant decision. In order for a forum to assert specific personal

jurisdiction over a non-resident, "there must be an affiliation between the forum and the underlying controversy, principally an activity or an occurrence that takes place in the forum state and is therefore subject to the State's regulation." *Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, __ U.S. __ (2021) (slip op. at *6) (citation omitted). The Supreme Court of the United States has also held the suit must "arise out of *or relate to* the defendant's contacts with the forum." *Bristol-Myers Squib Co. v. Superior Court of Cal.*, 582 U.S. __, __, 198 L. Ed. 2d. 395, 403 (2017) (emphasis supplied).

In *Ford*, the Supreme Court recently interpreted this quote to mean:

> The first half of that standard asks about causation; but the back half, after the "or," contemplates that some relationships will support jurisdiction without a causal showing. *That does not mean anything goes. In the sphere of specific jurisdiction, the phrase "relate to" incorporates real limits, as it must to adequately protect defendants foreign to a forum. . . . ,* we have never framed the specific jurisdiction inquiry as always requiring proof of causation—*i.e.*, proof that the plaintiff's claim came about because of the defendant's in-state conduct.

*Ford Motor Co.*, __ U.S. at __ (slip op. at *8-9) (emphasis supplied).

In a footnote, the majority's opinion in *Ford* re-affirms a state court *does not* necessarily have jurisdiction over a nationwide corporation for any claim, no matter how unrelated the corporation's activities are to the forum state. *Id.* at __ ( slip op. at *9, n.3). Without this distinction and objective delineations, limitations on specific

personal jurisdiction for non-forum "nationwide companies" would be destroyed. Very few nationwide companies boast the size, scope, scale, pervasiveness, and ubiquitous presence across national and international markets Ford has achieved.

¶ 40 Here, CMI admits it "markets to the flying public at large" and has sold parts in all fifty states. CMI allegedly participated in 2,948 sales of parts transactions through independent distributors, which were eventually sold to North Carolina, and which totaled $3,933,480.65 in revenue in a three-year period preceding the accident, including sales of new models of the starter adapter at issue. The specific personal jurisdiction over non-forum defendant analysis partially "encompasses the more abstract matter of submitting to the coercive power of a State that may have little legitimate interest in the claims in question." *Bristol-Myers Squibb Co.*, __ U.S. at __, 198 L. Ed. 2d at 403.

¶ 41 This Court has upheld specific personal jurisdiction over a non-forum company, which availed itself of conducting business in North Carolina after a company mailed out 1,937 sales catalogs in North Carolina in a season, directly sold products to 239 North Carolina residents, and generated over $12,000 in sales. *Frans Pecans, Inc. v. Greene*, 134 N.C. App. 110, 114-15, 516 S.E.2d 647, 650-51 (1999).

¶ 42 In the complaint, Plaintiff alleged, "the defects in the aircraft engine existed at the time the engine and engine assemblies were built and sold, manufactured and designed." None of those actions occurred in North Carolina.

¶ 43     Plaintiff also alleges, and Defendant denies, the starter adapter was subject to a design defect, and the service manual available to Air Care was incorrect. None of those actions occurred in North Carolina.

¶ 44     The Lancair LC42-550FG aircraft over its life was equipped with at least three different starter adapters. The first starter adapter was replaced at the aircraft manufacturer's factory without explanation, prior to the original sale and delivery, and long before the O'Neals' subsequently acquiring the aircraft. None of those actions occurred in North Carolina.

¶ 45     The second starter adapter "was slipping," which necessitated the replacement. The third starter adapter was not sold by CMI. It was sold from and by Aircraft Accessories of Oklahoma, who sold the remanufactured and overhauled part to Air Care in North Carolina, who ultimately installed the part on the O'Neals' aircraft based in North Carolina.

¶ 46     The part CMI had originally manufactured was altered, overhauled, and remanufactured by others without any links to or oversight by CMI. This part was identified by investigators as a precipitating cause of the crash and would not have entered North Carolina to be installed on the plane, but for the Aircraft Accessories of Oklahoma company. The Supreme Court of the United States, in *Ford*, emphasizes "some relationships will support jurisdiction without a causal showing." *Id.* at __ (slip op. at *8). Neither of the two vehicles involved in the collisions in *Ford*, were

originally sold through a Ford Motor Company dealer network in the forum jurisdictions. Subsequent purchasers brought the vehicles into the respective forum states. Ford Motor Company neither designed nor manufactured the vehicles in the forums.

¶ 47          It must be noted that the phrase "relate to," and its meaning from *Ford* "incorporates real limits." *Id.* at __ (Alito, J., concurring) (slip op. at *4). The majority's opinion in *Ford* also cautions that "does not mean anything goes. In the sphere of specific jurisdiction, the phrase 'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum." *Ford Motor Co.*, __ U.S. at __ (slip op. at *8-9).

¶ 48          The majority's opinion in *Ford* does not articulate any guardrails or outer limits for lower courts to follow when evaluating whether due process concerns prevent a court from establishing specific personal jurisdiction over a non-forum defendant. *See id.* at __ (Gorsuch, J., concurring) (slip op. at *3).

> Where this leaves us is far from clear. For a case to "relate to" the defendant's forum contacts, the majority says, it is enough if an "affiliation" or "relationship" or "connection" exists between them. But what does this assortment of nouns *mean*? Loosed from any causation standard, we are left to guess. The majority promises that its new test "does not mean anything goes," but that hardly tells us what does. In some cases, the new test may prove more forgiving than the old causation rule. But it's hard not to wonder whether it may also sometimes turn out to be more demanding. Unclear too is whether, in some cases like

> that, the majority would treat causation and "affiliation" as alternative routes to specific jurisdiction or whether it would deny jurisdiction outright.

*Id.* (internal citations omitted).

¶ 49 Multiple cases remain undisturbed where the Supreme Court of the United States articulated and delineated significant due process protections from assertion of personal jurisdiction over a non-forum defendant: *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 921-929, 180 L. Ed. 2d 796, 804-809 (2011) (tire manufacturer who manufactured tires in Turkey, did not import the tire model into forum state, nor primarily distribute the tire model in the United States, could not be haled into forum for incident occurring in France despite parent company having large factory in forum); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 298-299, 62 L. Ed. 2d 490, 502 (1980) ("mere unilateral activity" of plaintiffs to bring car into forum did not establish jurisdiction because defendants did not have minimum "contacts, ties or relations"); *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 416-19 80 L. Ed. 2d 404, 412-14 (1984) (forum did not acquire jurisdiction over Columbian corporation where that corporation contracted in Peru to provide services, even though some goods were purchased in and some training occurred in forum); *Daimler AG v. Bauman*, 571 U.S. 117, 139, 187 L. Ed. 2d 624, 641 (2014) (forum may acquire general personal jurisdiction when a defendant conducts an overwhelming amount of activity within the forum); and, *Burger King Corp. v.*

*Rudzewicz*, 471 U.S. 462, 487, 85 L. Ed. 2d 528, 550 (1985) (forum's exercise of jurisdiction not fundamentally unfair where corporation had substantial and continuing relationship with plaintiff-company's headquarters in the forum, contract documents provided notice and the course of dealing between the parties provided that corporation could be subject to suit in forum).

Here, while CMI does not approach the nationwide size, scope, and scale of Ford, its activities "related to" North Carolina more align with the facts in *Ford* than those of the decoy maker in Maine selling his hand-carved unique products online across state lines as memorialized in Justice Gorsuch's concurring opinion in *Ford*. *Id*. at __ (Gorsuch, J., concurring) (slip op., at 4).

## II. Internet Based Service Manual

The trial court found CMI "has not conducted any regular or ongoing advertising, solicitation, marketing, or other sales promotions directed toward residents in North Carolina." In *Havey v. Valentine*, 172 N.C. App. 812, 816-17, 616 S.E.2d 642, 647-48 (2005), our Court adopted the United States Court of Appeals for the Fourth Circuit rule for determining whether an internet website can become the basis for the exercise of personal jurisdiction in the forum in *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707 (4th Cir. 2002). *ALS Scan, Inc.* adopted the analysis from *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D.Pa. 1997).

In *Havey*, this Court held:

> A State may, consistent with due process, exercise judicial power over a person outside of the State when that person (1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts. Under this standard, a person who simply places information on the Internet does not subject himself to jurisdiction in each State into which the electronic signal is transmitted and received. Such passive Internet activity does not generally include directing electronic activity into the State with the manifested intent of engaging business or other interactions in the State thus creating in a person within the State a potential cause of action cognizable in courts located in the State. *When a website is neither merely passive nor highly interactive, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs.*

*Havey*, 172 N.C. App. at 816-17, 616 S.E.2d at 647-48 (emphasis supplied) (internal citations, quotation marks, and alterations omitted).

CMI's website is an interactive informational website. The website provides an "online technical library" where subscribers can "access instructions and manuals." Fixed-base operators and service centers, like Air Care could go to CMI's website and pay a subscription fee to access the "online technical library." CMI had 14 paid subscribers in North Carolina. CMI posted updates to this manual and notified its subscribers of the updates. While Air Care maintained a subscription to

the manual, it is unknown whether their technicians accessed or referenced the manual while installing the remanufactured Starter Adapter on the O'Neals' aircraft.

¶ 54 "A passive [w]eb site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction." *ALS Scan, Inc.*, 293 F.3d at 714. CMI supports the "online technical library" with updates to notify its subscribers. The website contains a commercial nature due to its paid subscriptions. When considered with CMI's other contacts "related to" North Carolina and its "purposeful availment" of our forum, these contacts are sufficient to support our holding of specific personal jurisdiction. *Havey*, 172 N.C. App. at 815, 616 S.E.2d 646-47; N.C. Gen. § 1-75.4 (2019).

### III.    Conclusion

¶ 55 CMI properly raised the defense of lack of personal jurisdiction in its Answer to Plaintiff's Complaint. A North Carolina court exercising jurisdiction, pursuant to our long-arm statute, does not violate the Due Process Clause of the Fourteenth Amendment. This interlocutory appeal is properly before this Court.

¶ 56 Consistent with *Ford*, CMI is being haled into North Carolina's court, not for its nationwide contacts, nor fifty states' presence, nor merely placing an item into the stream of commerce, but for its specific contacts with North Carolina companies and consumers. I concur in part and concur in the result in part.